Good afternoon, Illinois Appellate Court, 1st District Court is now in session. The First Division, the Honorable Justice Aurelia Potenski presiding, case number 21-0666, 4043 S. Drexel Condo Association v. Joseph C. Burke. Okay, we're going to wait for Mr. Hagen to get his video and audio, okay? No audio and no video for Mr. Hagen yet. Do I have audio now? Audio is good, but did you want to see the video? Okay, I'm not sure why you can't see me. At the bottom of your screen there's something that says start video. There you go, see now we can see. We can still not see Mr. Hagen. Start video. See something that says that? I did and I just clicked on it and I'm not getting anything. Homer, is your camera covered? No, it's not. Unfortunately, this is the... Zuckerberg covered this with masking tape, so maybe you did. Are you on a laptop or a desktop, Mr. Hagen? I'm on a laptop. Okay, check in front of the laptop just to make sure that the camera is open.  There we go. Okay, excellent. Thank you very much. I'm technically challenged. It happens to the best of us. Okay, we are on 43 South Drexel Condo Association versus Joseph Burke, etc. Case number 1210666. This is the first division, first district of the Illinois Appellate Court. As you see on your screen, me, Aurelia Piotrowski, Justice Aurelia Piotrowski, I'll be the presiding today. I apologize for Justice Michael Hyman. He's unable to join us today, but he has read the briefs, read the record, and read the cases. So he's very well prepared to discuss this case with my colleague, who you do see, Justice Mary Ellen Kotlin. Now, if you could introduce yourselves, please. We'll start with the plaintiff Drexel Association. Yes, I'm Jeff Hagan. I represent the 4043 South Drexel Condominium Association in this matter. Okay, and we're Mr. Burke and Associates. Yes, General Leary, Your Honor, representing Joseph Burke and the Global Assets and other LLC defendants. Okay, great. Mr. Hagan, Mr. O'Leary will conduct this just as though we were all together in court. You'll each have about 20 minutes. I suggest the plaintiff save a couple minutes for rebuttal, and we may interrupt you with questions. So hope we don't get you too far off track from what you want to say. Remember, please, that we've read the record, the cases, and the briefs. So with that, Mr. Hagan, if you'd like to begin. Okay, I'm going to assume, I think the facts in this matter are fairly straightforward, so I'm not going to go into any facts unless you have specific questions. So the decision by the trial court in this matter prevents the 4043 South Drexel Condominium Association from accomplishing its contractual purposes. The association cannot enforce mutually, and I'm citing from the whereas clauses of the declaration. The association cannot enforce mutually beneficial restrictions and obligations with respect to the use and maintenance of the property. The association cannot promote and protect the cooperative aspect of ownership, and the association cannot enhance and perfect the value, desirability, and attractiveness of the property for all the owners. Well, isn't part of the problem that the association didn't follow its own rules in the first place? I don't believe it did. There's one rule that the court, that they certainly didn't follow, and that was the way to communicate. They communicated by email. But in 2000... Supposed to communicate by mail or in person, is that correct? That's correct, and that's an issue that, I mean, obviously it was clear from the start of the proceedings. We never denied that they communicated by email. Okay, and they also, when they originally set themselves up, they didn't create a rule that said, oh, we can communicate by email. Well, that's what I believe is somewhat of a question, and that's where I bring in a fiduciary estoppel. When they, Mr. Burke... I just want to know, is there any rule that was passed by any competent association board after proper notice in a meeting of the unit member owners that said, oh yeah, they can serve notice by email? Do you mean in 2017 or in prior years? Up to 2017. Okay, we don't know that because from 2008 to 2017, Mr. Burke, Joseph Burke, Defendant Joseph Burke was the president of the association. And in 2016, when most of the new resident owners joined, three of the four, three of the five, I believe, he called the first meeting of the board, or the owners to participate in an election of a board. He did that by mail? What's that? He did that by mail. That was done by email. By email, okay. It was done by email. In the vernacular, this association and board has been screwed up for a long time. It has. Now, Mr. Burke claims in an affidavit that's in the record, I could give you a cite to that affidavit to a particular point, but Mr. Burke claims that he was never a part of the board. He was never elected to the board. He never, right? But from 2008 to 2017, he filed documents with the state of Illinois saying he was the president or the treasurer of the association. Understand here, I'm not trying to, at this point, say who's to blame for all of this. I'm just trying to establish that there didn't appear to be, I'm going to ask it in a different way. Was there ever a written notice by in-person or by mail sent to the unit owners about a unit owners meeting to elect a board at any time after the condo was established? Not that I know of, you know, not that I know of. So throughout the history of the board? No, as far as I know, throughout the history of the board, they always communicated through email. But that is contrary to the rules. Well, unless you all agree and all my clients, none of my clients had any problem with communicating by email. That's not the point. The point is there has to be, note that the rules require proper notice to the unit owners, a meeting of the unit owners with an agenda, a vote by the unit owners to change the rules. We can't find anything on the record that was ever done. There was never a request or any kind of documentation saying that they would communicate by email. Mr. Hagan, in the rules, they could have done it the right way because there are provisions that would enable the parties to do this. They just never did it, right? They just never did it because, again, not because they didn't, they just didn't know to do it. Well, assuming that they all have pure motives, but I think we can all agree that it wasn't done. Yes, even Mr. Burke communicated by email. Well, isn't that a problem for you? No, that's where you get into the two issues that we raised in our brief and we raised with the court about this one issue about how they were communicated. Nobody was prejudiced by not getting the notice by email. They were all at the meeting. But the rule doesn't say that it's okay so long as no one is prejudiced. Well, that's where you get into this issue of directory versus mandatory. And mandatory versus directory. I believe in this situation, and that's what I've argued in my brief, that this is a situation where this was directory. The intent of the statute, Conduit Act, with regard to this is that you don't have somebody that doesn't have the technical capabilities to communicate and they were kind of left in the cold. That never happened here. This issue was everybody communicated by email. Mr. Burke communicated by email. He never notified anybody he didn't want to communicate by email until I believe October 2018. That's not the issue. There's no opt out. We're not questioning whether people can opt out of email. And we're not worried about whether or not everybody got the email. We're worried about whether there was ever an actual legitimate change in the rules according to the rules to allow for email notice of meetings. We can't find one. Well, from 2008 to 2017, the records were maintained by Mr. Burke. And so whether they ever agreed to it, I don't know. The thing is... Can you point to a meeting of the unit owners between 2008 and 2018? Was it a meeting of the unit owners? They didn't keep minutes. To the best of my knowledge, they didn't have unit owner meetings. I'm not exactly sure how you expect us to unravel all this. Okay. I'm telling you that I think that it goes back to the fact that things have never been done according to their own rules that they agreed to when they bought the units in the condo. And then when these people started, when they bought their units, certainly the Cathy's, Mr. Doss, and Ms. Tiggs, when they bought their units, they were first notified of a meeting in April 2016. They kind of were asking, where is the association? Mr. Burke was the president of the association. They asked for a meeting in April 2016 to get together and organize a board, an elective board. Mr. Burke sent out the email in April 2016 describing a three-person board, an election process for a three-person board. They conducted the meeting. So we've already, I think, established that there is no authority to send out a notice by email. So I don't care if you send out the email. It makes no difference to me. There's no authority to do that. I look at this, and frankly, I'm just sort of wondering if the association can't do anything, and Mr. Burke can't do anything, and the unit owners haven't ever been notified about anything because nobody has the authority right now to notify the unit owners of anything because nobody's been elected according to the actual original rules that have never been changed. And everything is in such tangle. I'm curious about how any of you think this is going to get straightened out. Summary judgment. All right. Well, and from 2016, from April 2016, when they had their meeting, Mr. Burke was elected. What meeting? The meeting that was established by email. Yeah. Which there's no authority for. Okay. Well, and I understand what you're saying on that, but that's where we get into the mandatory versus directory. Everybody attended the meeting. Everybody agreed to the meeting. Nobody had a problem with the fact that Mr. Burke arranged the meeting by email. They voted. They elected Mr. Doss, a member, Ms. Ludlow, a member, and Mr. Burke, a member of the board, and they all. It was still a five-member board at the time. Well, again, there is no rule that says if there's vacancies in a board, the board can't act. There's a rule that says there's a five-member board that there has to be a unit owner meeting to change it to a three-member board. And there's a process to go through that if you're concerned because there's a vacancy, you can do a petition and you can fill the vacancy. The vacancy. Don't you have to give notice by mail or in person to the unit owners? For the process to fill vacancies? I think you just have to petition the board. I believe. The board that was elected after an email meeting. So it's a board that wasn't a board. Well, again, if the owners get together and they form a board, and that board is in, all the owners are in agreement that that's their board. I don't, I believe that is the board. There is, there's also from 2007 to 2008, Mr. Burke filed, excuse me, from 2008 to 2017, Mr. Burke filed annual reports with the Illinois Secretary of State indicating the board, who the board, and it was always a three-person, it was three-person directors or whatever on in that entity. And those, those forms are in the record. And if, if there is no board and you have an entity that's been set up to manage the association, that is the board. So Mr. Burke, what's that? It's after an email notice, which is not authorized. In that, that, as far as setting up the entity, I'm just reading from the case law that says that the directors of an entity set up to manage the association is the board, absent a elected board. So in 2017, in 2016, when he called everybody together as president of the association, there was, by email, there was a, there was a, a board, as far as the Illinois Secretary of State was concerned. Okay. Okay. What's your next best argument? Okay, well, the issue that we're, these folks from, from 2016 to 2021, the resident owners with Mr. Burke's concurrence, managed the association. They had, I think in 2016, they had debt of $19,000 or so from unpaid utilities and whatnot. And they managed that. They, they made sure they were tracking all the assessments, because the assessments prior to that point from each of the units had not been tracked. And Mr. Burke owned five or six units at the time, right? At the time. And the assessments that were missing were from his units. Yes, I think he bought the last of his seven units. At that time, he had seven units after the litigation was started. While he was the president, after a meeting that elected him president, that was not an authorized meeting, he had stopped paying the assessments for his own property. And then all of a sudden, somebody said, hey, wait a minute, where's your money? And he said, oh, I'll pay it. And he paid his money. Well, between 2008 and 2017, there wasn't, there wasn't a great deal of records kept, as far as business records that were acquired by the association. He claimed that he was the president. Exactly. And again, reported to the Illinois Secretary of State that he was the president or the treasurer. Why should anybody trust him now to keep valid records and to write them? Well, that's what happened in 2016, when the Cathy's bought their unit, which is, is occupied by Miss Ludlow, who was the sister of it. What's that? She's a renter. No, she's the sister of one of the Cathy's. And they, she bought it. It was really bought on her behalf, but she just wasn't able to handle the financing at the time. So her sister and husband bought it. But, but so she lived there. But the Cathy's, once they bought the unit in 2000, I think it was in November of 2015, they started asking to see the association records, the financial records and whatnot. And they weren't getting anywhere with that. And that's why in 2017, they started litigation asking to see the records of the, you know, to review the records of the association. When they were able to get, once they were able to get those records, the payment of assessments was very spot, who paid assessments and the records for assessment payment was very spotty. And that's why eventually though, that, that lawsuit, the 2017 litigation, Mr. Burke and the, the, the resident owners, the other owners settled that. And he agreed to pay $40,000. The, the review indicated that there were $60,000, approximately $60,000 of assessments that hadn't been paid by his units. He agreed to pay $40,000. So what are you asking? I just want to cut to the chase. What do you want this court to do? What I'm asking, once he bought the unit, the eighth unit in 2000 and after this litigation, I think it was in 2021, I'm not sure. No, no, I've been 2019. I think it was after this litigation began. He bought an 18, an eighth unit to, so that he has majority control. And so I think the issue for the court at this point is that giving someone a, a, a for-profit business that has aid, it has majority interest in the, in our majority control over the association, the right to totally control that association cannot stand. I mean, that is, so we can't go back. I mean, he's got eight units. And so I think what has to happen is there has to be a, what is the term? A trustee. It's not a trustee. It's in, it's in the receiver or a custodian. And I think at some point he has to sell two or three of the units that are over the maximum that are allowed because he can't continue as, as the, the president of the association and the controller of the association. He has a conflict of interest. He is, there are two classes of, there are now two classes of, of, of owners. There's the rent, the resident owners and the renter owners. And he is, he, he owns all eight or controls all eight of those renter units. And so the association can not control part of the declaration. Again, we're into this idea that the, the, the declaration needs to be strict, strictly adhered to. If there are more than. Sounds to me like anybody's adhering to any of these rules. Well, Justice Compton. I mean, it's kind of self-serving argument you're making counsel. It's okay to ignore certain, but then, you know. Do you want us to say that these other roles that have, I guess, theoretically are in place that we should ignore those because it's giving him a majority and then that's not good for everybody. Certainly this hasn't played out like an organization would like you'd want it to play out. But at the same time, look at, look at on one side, their rule is they used a tech, they used email to communicate, which everybody agreed was okay. On the other side, what we're talking about a rule is a rule that protects the value of the property for all owners. But even if they did agree. And I'm not sure that it's that clear cut in the record, but assuming that you are correct, it doesn't matter because that is not the rule. They still follow the rules and if they want to do something different, then there's another role that they can adhere to if they wish to do that. And they didn't file. They didn't follow any of these rules. And then by email, they could have done, they could have, there was a procedure that would have enabled everyone to do that and they didn't follow that either. The president of the, the president of the association. Now, he'll say I was never elected, but again, I'm talking about through the secretary of state and his indication to the secretary of state that he was the president of the to form to elect the board for, for going forward. These, these folks are new to this building. They're new to this. But I'm puzzled by that. So are you saying that just because someone files something that that's case dispositive that, that, that, that means that it's actually. A given fact, what if he filed something and it was wrong? The authority to do it. The declaration calls for the setting up of this associate of this not-for-profit entity. That not-for-profit entity was set up by Mr. Burke. Again, the, the documents that he filed in 2008 are in the record. And from 2008 to 2017, he, he presented himself as the president of the association or again, the treasurer. Now I've cited in my brief cases. I think it's one of them. I think it's Goldman is the, the first name on the case or whatever, but yes, the, the legal entity absent an elected board, the Eagle, the legal entity set up to, to manage the association is the board. And, and that's in that case law. So, yes. So even though his argument is, well, I was never elected from 2008 to 2017, I was never elected, but he prepared the, the he set up the organization with the, the initial, yeah, with the secretary of state. I'm sorry. I apologize. I've had a brain freeze here, but he set up the initial entity and he filed an annual report every year from 2008 to 2017. So yes, conveniently a deadbeat owner, not paying his assessments. What's that? So during that same time, he was a deadbeat owner. He wasn't paying his assessments and more units for rent than the condo declaration allows. Yes. And, and I'm just, nobody's paying attention to any of the rules. No one's paying attention to the rules. And when people, when, when the, I know the Cathy's and the dog and Dawson and Mr. Dawson and Ms. Tiggs, I'm pretty sure all three of those bought their units in 2015. The first thing they start, the Cathy's initiated the process. They say, okay, let us see the books and records of the association and how the books and the association has been managed. He would not provide those. And that's why in 2017, they filed litigation seeking those records. So correct. The association has had a, certainly had a checker passed, but the new owners that start starting in 2015, three of those, three of them, two, two of the. There's only 12 units in the Sophia owns eight. Yes. Yeah. So he owns eight. So the Cathy, so there's three. And then there's the fourth one is a woman by the name of Sheila Robinson. And she, I believe she bought her unit in, she's an elderly woman. I believe she bought her unit in, I'm thinking 2014, but I'm not, I, I'm not a hundred certain, but she, she bought it. She had had the unit a little longer than the other, than the other three that bought that. I'm pretty sure they were all in late 2015. So once they, once they bought their units, they shot, well, where's the association? Who's the president of the association? Okay. So getting back to my question, what do you want this, what you do? You said, okay, Burke's for-profit business controls eight units in his control of the and then you said, we need a receiver. It was a suggestion by just to have a custodian and he needs to, and then you were worried about how many units he owns. And that's not within the original rules of the declarations. Those are the two things that you want us to do. I believe that what they're going to need at this point is other than, than to say, we need to follow, we need, I agree. They need to follow the declaration strictly. And the, and the declaration says the maximum number of rental units is four without the approval of the, of the association, but the trial court. Yes, it did. So once they bought the eighth, once they bought the eighth unit during, during these proceedings, I went to where, to where I'm saying, okay, you can't prevent him from from buying the eighth unit. He also transferred, his father had one of the units he bought for his father and bought in his father's name. His father didn't even know he had the unit, but our argument before the trial court was that he could not transfer that unit to himself. He had to sell that unit to a resident owner. But he, but he didn't. He transferred, he, he transferred the unit from his father to himself. So, so my opinion is what I had hoped would happen during, during these proceedings was that the father's unit would be transferred to a, a resident owner, to somebody not for rental purposes. And instead what he did, he transferred that unit and he bought another unit. So he had majority control. So my opinion is a provisional, what I was looking for was a provisional director or custodian. Somebody just has to say, okay, here's how we're going to run this organization. You're going to have to comply with the declaration with regard to the number of rental units. And that means you have to sell four of your, four of your units. And, and then they need to, to, once they have sufficient vote to, to fully enforce the declaration, then the, then a new board could take over. But the, the, the thing is, because of the, in, in 2000, I think, again, this lawsuit was filed in 2018. I believe he bought the eighth unit because one of the recommendations of the trial judge was, why don't you all get together, call a meeting properly, elect a five-person board and move forward. And again, it's in the record. We contacted Mr. Burke, I think it was October 23rd. I can, for whatever reason, the date kind of strikes and sticks in my head, 2019. And let's, and we said, we'll all resign. You all resign. Let's have a meeting, create a board with five people. Instead, he went out and bought the eighth unit so that he had majority control. And the problem is, again, even in his brief, his, his appellate brief, he says, we don't have to, and I'm paraphrasing obviously, but majority, now the majority of the ownership wants to allow unlimited rentals. So therefore we should. That's not the declaration, that's not what the declaration says. The direct declaration says that there can be a maximum of four and then the board has the, has the discretion to allow a fifth or even a sixth. If an owner comes to them and says, listen, I, I'm having a problem selling my unit. I need to get out of here. I need to sell the unit. I need to rent the unit until I sell it. They want the discretion to be able to do that because that helps the ownership of all owners. So we have to get back down to where there, there is control. So even if, if he went down to four units, which is, means that there can be no, then, then the discretion kicks in and, and, and the board can allow additional rental rentals if, if needed, but no one, no more rental units. So that's what I think that's where they wrap it up. What, okay. What's your closing? My closing is yes, this has been a troubled association. From 2008 to 2017, Mr. Burke had complete control of that troubled association. I don't know that there was ever any other board members, any other membership meetings, any, nothing. In 2016, three new owners came in and said, let's get control of this. Let's have a board meeting. Let's, and they did it incorrectly. They, they, they, they talked to Mr. Burke and Mr. Burke sends out an email and says, let's get together and have this, this meeting. They did that. They had a, they had a board. It had three, it was only three because they thought three was sufficient and that's why they intended to, to, and they thought that all the owners were in agreement to switch it from five to three, to amend it from five to three. But, but Mr. Burke again, changes his mind on that. So it has had a checkered past, but going forward to put Mr. Burke in charge of this association, put a nonprofit, a profit business in charge of a nonprofit entity, that's not working for anybody. And that can't be. And therefore he has to, to divest of those, of at least four of those units and bring this back in compliance with the declaration. Okay. Let's hear what Mr. O'Leary has to say about all this. Thank you, Your Honor. I've been holding my tongue here. I think you may understand. I have some serious disagreements with my, what Mr. Hagan has asserted here. First, it's the unfortunate. Let me just start with the basics. Is it correct that the statements to the secretary of state indicated that Mr. Burke thought he was the president of this association for a number of years? Uh, the statements to the secretary of state, I don't know what Mr. Burke thought. He thought that he did, he did, he did file statements with the secretary of state, uh, because he thought they needed to set up a not-for-profit corporation. That's my question. Do the filings with the secretary of state indicate that Mr. Burke put down that he was the president of this association? I, I believe that, I believe they did that. Okay. And let's just establish that for a certain number of years, Mr. Burke did not pay the assessments that he was required to pay. That's not true. Let me, let me go over. Yes, he, yes, he did. Yes. Let, let me go over the, uh, the, the history and where this issue has led. Is it correct that the meetings that Mr. Burke called were called by email without any official authority to do that? Well, that is not true as to, as to his notice of the meeting that is the, uh, uh, July of July of, uh, 2018, uh, he sent out a written notice by certified mail to the owners, setting up a, uh, and, uh, uh, sponsored by 20% of the unit ownership, uh, setting a, uh, meeting to elect a proper board of directors to it, to section 5.1 of the declaration. At that point, he already owned eight of the units, which is not true. That's not correct. Can somebody figure out whether feedback is coming? I know it's very, I can't even barely hear. I checked. It's not for anything that I've got going on. Does anybody. I've only noticed that since you started talking, Mr. O'Leary, I think it must be you. Do you think it's your earbuds or something like that? I can change my, uh, now it's not doing it. Okay. Is that, is it okay? This is okay. I don't know whatever you did now. It's all right. So my question was, now it's back again. Now it's doing it again. Okay. I'm going to say something and see if it's me. No. Okay. See if that, uh, did that improve it? Sorry. Technology is weird. No idea. Excuse me, Mr. O'Leary, do you have a cell phone or something on in your office? Uh, I have a cell phone, but it's, uh, something has been reverberating the whole argument. I couldn't catch what it was. Uh, Mr. Hagan, mute your microphone, Mr. Hagan. Okay. Try it now, Mr. O'Leary. Uh, is this any better? Can you hear me now? Is that okay? Yes. Yeah. Okay. All right. So my, my last question in this series was what, after he sent out at the time that he sent out this notice by certified mail to call a unit meeting, a unit owner's meeting, he already owned it. Eight units, which is more than the four that's allowed. No, that's not correct. What is he? He, he owned it. Well, he owned, uh, maybe, uh, maybe five units. His father owned one and, uh, and, uh, an associate that is in agreement with him owned another. So he owned, I believe it was seven units representing less than 50% of the ownership of the association. He was the president or the director of the corporations and all the other three. He was, uh, it's, uh, the, their LLC. So he was an agent or member of, uh, five of the LLCs. A very sweet way to get around the four apartment for kind of rural, right? Well, I don't, that was, there, there is not, uh, a, any kind of a, uh, the, the history of the association kind of explains how this, uh, uh, occurred, uh, back in 2008. But the declaration says four, is that correct? No, the declaration says that, uh, rental, uh, uh, 39% by ownership of the rentals of the, uh, of the units can be rented without written consent of the board and up through, through the time, even that, uh, Mr. Uh, Hagan's clients bought units more than 50% of the, uh, owners of the owners were, uh, renters. This association started in 2000, uh, 2008. Uh, it, uh, uh, the developer went under shortly thereafter. Mr. Burke only owned one of the units until 2012. This is affidavit and the record will reflect and, uh, following that there are numerous of the units were, uh, troubled and not paying assessments and went into foreclosure. So for the city manager controlled or own? No, that he eventually, uh, eventually purchased. They were in foreclosure, uh, not paying assessments. He would advance, uh, uh, uh, uh, expenses for the association. He eventually bought, uh, I believe four of the units units. Is there anything in writing to document that these units were in foreclosure and that he funded some money for them? Well, there's an affidavit that hasn't been controverted. That's in the record. He's got a 10 page affidavit because there are no minutes of any meetings. Well, the, the, there is, uh, I mean, he did document in the, in the record that he, uh, that he purchased, uh, units that were in foreclosure that had been advanced. And, uh, what, what's not in the record is that are the representations that Mr. Hagan is making, trying to represent that he was, uh, he was, uh, delinquent and assessments. Much of the dispute on assessments arose because he purchased foreclosed units. And there was an issue as to, as to whether, and when he purchased them, how much of the assessments of the foreclosed units he was responsible for. They had a, during the time that he owned units, he paid all of the assessments going forward from the time that he owned them. But there was this dispute that arose when the litigation was filed in 2017. So of the eight units that he controls, how many are rented? All of them are, uh, are, uh, rented. All of the eight units are 12 units in the building. Yes. So that's 75% of the units are rented? Well, by percentage ownership, it's probably like 56% because the declaration identifies that, that 39% by ownership of the units can be rented without the, uh, consent of the board. Prior to the time that he... Well, was there ever consent by any board? Yes. That the, the, what there was a, uh, in, in connection with the, uh, settlement agreement and the litigation, there was agreement that the, that the units that were rented could continue to be rented. This was a dispute that came up in prior, prior litigation. And they, the, and as we've, uh, argued in our, uh, brief, there's no designation in the declaration prohibiting the rental of more than 39% of the units. The declaration provides an opportunity for the board to determine whether this is in the interest of the owners, including it would have to be the owners who, uh, who... But that was not done in this case. In which case? In this case, that wasn't done. There, like so many other rules, there is a provision, there's a right way to do it, but it wasn't done here. Well, it has been done since the time that Mr. Burke's, uh, Burke, uh, the board that was elected in 2018 pursuant to the notice, uh, done by... Well, I thought that the resolution was that the renters that are already there, that there was an agreement that they can continue to stay there until the end of their lease, and then it will be revisited. No, that, that, that, that wasn't... So there's an agreement they can just stay there forever? The settlement agreement was... Well, there... Yes, that, there, that, that was a part of the settlement of a case that, that, I mean, those issues and those facts aren't even in this record. You know, it sounds like we're getting kind of far afield here. Let me just ask you the same question Justice Puchinsky asked Mr. Hagan. What is it that you are asking us to do? The, the, the, I'm asking you to affirm Judge Voptis's, uh, order. The order, the order provided who the properly elected board of directors was. There was, and it provided, it provided that there was an, uh, an election properly held pursuant to written notice in, in August 2nd of 2018 and subsequent, uh, annual meetings to elect boards of directors since from 2018 through the time of the order and identified the, who the board of directors, the properly elected board of directors was. That was pursuant to a meeting held by, uh, pursuant to written notice in accordance with the provisions of the declaration sent to all unit owners. Back in 2000, in July of 2018, July 23rd. Okay. But by that time, Mr. Burke was already the owner or control the interest of eight units. No, no, that's not correct. The record shows that the, the, uh, the, uh, notice for the, uh, for the meeting to elect the board of directors in July of 2018 was at a time when, uh, Mr. Burke did not own, uh, more than 50% of the units. Yeah. I apologize. I didn't hear that. Your honor. Did he own more than 39%? Yes, he did. He, he owned the project. By what authority did he do that? By what authority did he send out the notice? By what authority did he own? Did he rent out more than 39% of the units? He rented, he rented them out at that time pursuant to the settlement agreement signed by all of the owners that permitted him to rent out the parties, including some of the the other owner was renting units. There were only three, uh, uh, units that were not being rented at the time that the settlement agreement signed by all of the owners was entered into. There was a, there was a history that this building was a, uh, was a rental building until, uh, through the history of the building from 2008 all the way up through, through the present time so that the, uh, the owners and Mr. Burke testified in his affidavit that there really weren't, he could not get owners to attend meetings during the time from 2008 till 2016, uh, and so the building operated, operated, uh, informally during that time period. He said, uh, when, uh, in 2017, he was sued by the other owners at the, and at that time he examined the declaration, got, uh, and decided that they should begin operating the building pursuant to the, to the strict provisions of the declaration. He sent the notice, he sent the notice out to elect a five-person board pursuant to the declaration. Uh, he sent it by certified mail. There's a transcript in the, uh, in the record. Although the other owners constituted a majority and could, and could, uh, have voted whatever directors they wanted to have, they instead told everyone not to show up at the meeting and not to participate in it. At that time, they had the, those other owners, if they are objecting to what Mr. Burke did, had the, uh, had the votes to control whoever would be on, on the board. They, they decided at that time, and, and, uh, the record will show they, uh, that they were, they even told everyone not to show up at the meeting, that they would not, that they would not, uh, and Mr., the, uh, owners who were present at the meeting voted for a five-person board. That's the board that Judge Loftus determined was properly elected board of the association. Now, if there are issues about the, uh, about the, the percentage of rentals, uh, that is, uh, an, an issue that should be raised pursuant to if there is a breach of fiduciary duty by approved board members, by approving rental renters, that is a, uh, that is a matter that should be raised, uh, in, you know, or could be raised in another complaint. That's not the complaint before the court. What's before the court is just the determination of who the, who the, uh, properly elected board of directors is. That, that, there, I've made arguments that I think that it, that it would be improper to automatically restrict, uh, the owners from renting units in excess of 39 percent. It would violate the, you know, the general principles of restraint of alienation on property that people should, there's nothing, there's nothing. Mr. O'Leary, when you, when you buy a condom, you buy it and agree by buying it to the declaration and the declaration says 39 percent, unless the board says, okay, so, you know, your whole ownership argument isn't going to go anywhere with me because that's what you agreed to. That's the contract you agreed to. I don't really, I don't disagree with that. Your honor. What I'm stating is that all the owners also agreed that the board could make a determination that more than 39 percent. Was that in the notice of the agenda of the meeting that was mailed out? That there would be the issue that would be voted on? No, that the issue, the only issue that was voted on by, uh, pursuant to the owner's meeting called, pursuant to the declaration by 20 percent of the ownership interest was for the election of a board. The other subsequent board meetings are not really an issue in this case and were not litigated. That, that, this really just goes to Mr. Hagen or his client's motivation just to, that, I mean, they've vilified Mr. Burke throughout this litigation and, and they've, and they have, uh, uh, decided that, uh, whatever his interests are, we have to be opposed to. But that, that is not what the declaration that they signed on for really, uh, is really about. The issue that they've, that they filed was to, uh, was to determine who the properly elected board was. That is count one, that is of the, uh, the complaint. That is the, uh, that, that is the issue that was, uh, briefed and summary judgment was, uh, was awarded to the defendants on prior to the, the, uh, uh, additional, additionally, the, uh, a couple of the owners also decided that they were going to record an amendment to the declaration. I think we've, uh, addressed that, uh, they, they, without, uh, submitting an, an amendment to the, uh, owners at a meeting call for the purpose of amending the declaration, they just recorded an amendment. Is that the amendment to have it be a three-person board that you're referencing? Yes, your honor. That's, that's correct. So they, uh, they, they, uh, without a meeting to approve it after Mr. Burke sent out his uh, uh, uh, notice by certified male pursuant to the declaration to elect a, uh, a board, a five-person board pursuant to the declaration between the time of that notice on July 23rd. On July 26th, the 28th, I believe they just recorded this, uh, uh, amendment to the declaration. So the court, uh, determined as part of that, uh, motion for summary judgment that that amendment was not, uh, validly adopted and, uh, was, uh, to be, uh, voided. So that the issue that, uh, we have promoted throughout the litigation since it began was to, uh, follow the declaration. And the, that is what Mr. Burke has done since that July 23, 2018 notice. Now, the, the fact that they're, uh, they now have a properly elected board, the board, that board determined that this litigation should be dismissed and that there was no authority to continue this litigation. We filed a, uh, motion to dismiss the appeal on, on that basis. If there are issues between the parties, I, those are, are not the issues that are pending, uh, on, uh, on the, on the court below or in this appeal. If there is a, if there is an issue as to whether Mr. Burke should be able or the other owners should be able to rent units there, they, there is in our opinion, a requirement that they establish that, that is a breach of fiduciary duty and file facts to support, uh, support all that, uh, basis of a breach of fiduciary duty count would entail. They would have to, uh, both establish that, that, that the awarding, uh, the allowance of additional units was an abuse of discretion. They would have to determine that. So you're saying that they would have to file an individual action and that shouldn't be before us. That's correct, Your Honor. I believe that was the, the, uh, ruling of the lower court that if these other counts, the counts two through, forget it, six or seven, that if those, those counts can be established, they should be done in an appropriate derivative action. If there is a, you know, if there is a claim, I mean, if there is a breach of fiduciary. I don't think there's any dispute. We agree that that is what the court did. And I believe that that's the proper result that the, uh, the, the board of the association, uh, has been, uh, elected. If there is some basis to appoint a receiver for the association, that is draconian relief that has to be established by, uh, by at least in my experience, some pretty substantial, uh, facts of, uh. Was there a request made to the trial court? No, not, no, it certainly wasn't made in the. I really don't think we should even be addressing that. There are, uh, that, that is why, at least in our brief, I tried to focus entirely on the claim established, uh, a 2% or a three person board was not noticed in accordance with the declaration. Uh, additionally, the, they didn't even vote at that, at that meeting, they sent an email later, uh, days, uh, the day later with, uh, uh, ballots to vote electronically and, uh, the statute and the condo act providing for electronic. I think we, we are familiar counsel with, I apologize. Uh, but, uh, uh, the, the relief that we are asking for is to affirm the lower courts, uh, decision determining who the properly elected board was. And, uh, but any, any other relief or argument about other, uh, relief should be relegated to another properly filed action. If that's, if that is even warranted. Any other questions of Mr. O'Loughlin? Judge Carbone? Oh, no, no, no, I don't. Thank you. Mr. Hagen, two minutes, please. I can't hear you. You're muted. I found it. Sorry. I was looking for the mute button. Um, on the issue of dissolution, obviously we don't want dissolution of this association. Somebody has to manage the associate and manage this building. My, I've got four clients that are that this is their homes and somebody has to manage it in a fair way. But the issue of dissolution was brought up with the, with the trial court, uh, because of the fact that he had taken, he had bought the eight unit eighth unit in 2019. Uh, it's in the motion for, um, it's in response to his motion for summary judgment. I'm pretty positive that's where it is. Um, but I, I didn't check specifically, but the issue of dissolution, uh, of the dissolution, the, uh, not-for-profit dissolution, uh, provisions is, is, was brought up. Um, the, the one thing I, I find interesting is Mr. O'Leary says that starting in July of 2018, uh, Mr. Burke strictly complied with the declaration. Uh, but prior to 2018, when he was buying all his units in violation of the declaration, we just have to forget all of that. And so that's just, uh, I, I find that amazing. Um, the amendment, uh, is somewhat of a red herring because nobody cares whether there's five directors or three directors because the issue is, um, you typically in a, in a, in a, in a, uh, condominium association with a hundred people to get five people that will, will volunteer is difficult. Uh, so the issue here is that he's got majority control. So it doesn't matter if there's three or five. It's to me, that's somewhat of a red herring. Did they do it wrong? They did it wrong. And, and, and, uh, he misled everybody. I mean, you have in the record, the, uh, the meeting where they agreed to go from five to three, but, uh, and he was there and it's recorded, um, in July of 2018, oh, uh, the settlement agreement that, that Mr. O'Leary referred to is in the, um, um, the record. It's attached to affidavits from Mr., um, Mr. Burke. But the thing is what they agreed is at the time he owned seven units. Uh, one of the units was owned by his father. And so if they were going to transfer any of the units, they had to, um, transfer them to somebody that, that was going to live in them. They couldn't transfer them to some for rental purposes. That's what the settlement agreement says. And it is in the record, uh, to, to check the words. And I think in the brief, in my brief, or certainly in my reply brief, I've discussed the, um, the issue with the settlement agreement and what the agreement was with regard to continuing rentals, because they did, they, they tried to work with him. He had seven units already. They did not try to tell him at that point that he had to sell them. They tried to work with him. They wanted to help. They wanted to be involved in the, the leasing decisions, uh, so they could make sure they could kind of somewhat vet the, uh, renters and whatnot, but they did try to work with him on that. Um, as far as did, uh, uh, judge present potentially, you asked him if he did not pay his that he was not paying the assessments on his units and on these other units that he purchased, which as a director of the association, it was his responsibility to maintain the records of the assessment payments and make sure when those units were sold, the assessments were dealt with in a proper manner. So I'm going to be an object to references. This is Mr. Hathens. Well, the, um, so the, uh, the association came up with that, that he was you've hit your mute button. I wonder how I did that. Try not to touch that still muted, unmuted. Can you hear me now? Yeah. Yeah. Okay. Now I got my hands off. Good. Um, the, uh, association came up with that. He was $64,000 short. He paid $40,000. So if he wants to say he paid all of the assessments, there's just, that's not in the record. Um, so, um, and the 39th, well, I don't think that's it. Uh, so he did have at the time of his meeting in 2018, he called that meeting, gave them 10, 2007, a 10 days notice. He said he wanted to elect a proper board. Um, and they were confused. They said, what do you mean we have a proper board? So they communicated with him, but he didn't respond back. He just waited the 10 days, held his meeting. And so yes, at the time they were confused by the meeting, they didn't feel it was valid and they didn't attend. Uh, and, and that's in the, that is in the record. Okay. Okay. I believe of the things that he, that I noted, I responded to. Thank you. Any questions? No, I have none. Gentlemen, thank you very much for your, um, interesting and often colorful arguments. We record, which we have read thoroughly. I'm sure again, to make sure that we're paying attention to what's actually was before the trial court and not extra stuff that's been thrown at us. And in the meantime, I'm happy to advise you that we will take this case under advisement. Thank you.